**NOT  PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1594
_____

UNITED STATES OF AMERICA

v.

RONALD J. O'MALLEY,
Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 2-10-cr-00578-001)
District Judge: Hon. Dennis M. Cavanaugh
_____

Submitted under Third Circuit LAR 34.1(a)
September 10, 2012

Before: SMITH, CHAGARES and ALDISERT, Circuit Judges

(Filed:  September 12, 2012)
_____

OPINION OF THE COURT
_____

ALDISERT, Circuit Judge.

This appeal from the judgment of the United States District Court for the District
of New Jersey arises out of an elaborate mortgage fraud scheme, which resulted in a 68-
count indictment against Appellant Ronald O'Malley. After O'Malley pleaded guilty to a
single count of conspiracy to commit wire fraud, the District Court sentenced him to 24
months' imprisonment. O'Malley contends that the District Court erred in interpreting the

Sentencing Guidelines to impose his sentence. We conclude that it did not, and we will affirm its judgment of conviction.

I.

Because we write primarily for the parties, who are familiar with the facts and the proceedings in this case, we will revisit them only briefly.

O'Malley owned and ran the Residential Mortgage Corporation, a private mortgage brokerage firm that assisted borrowers in securing mortgages and loans. His company received commissions from lenders for successfully connecting the lenders with qualified borrowers. During the time that O'Malley managed the Residential Mortgage Corporation, he was also a Chairman and Commissioner of the Bergen County Improvement Authority ("BCIA"), an independent public agency.

From 2006 to 2009, O'Malley and others conspired to bolster their commissions by defrauding lenders with intentionally falsified loan applications. Although O'Malley used many tactics to deceive lenders into approving the loans, of particular note here was his role at BCIA. O'Malley frequently (and falsely) reported to lenders that applicants were employed by BCIA, and used his position there to concoct fake pay stubs and factitious W-2s to that end. Based on just 40 of these phony loans, many of which have since defaulted, lenders paid Residential Mortgage Corporation over $200,000 in fees.

The government charged O'Malley in a 68-count indictment, alleging conspiracy to commit wire fraud, wire fraud, bank fraud, and loan application fraud. On August 23, 2011, O'Malley pleaded guilty to a single count of conspiracy to commit wire fraud. The District Court held a sentencing hearing on February 7, 2012. O'Malley vigorously objected to several proposed Guidelines enhancements. The Court rejected O'Malley's objections and found that: (a) he was responsible for $204,684 in loss, based on "the

2

amount of money, fees, paid to [Residential Mortgage Corporation]" by lenders for fraudulently obtained loans, App. 00074-00075; and (b) he abused a position of trust. Based on these findings, the Court calculated an offense level of 24 and an advisory Guidelines range of 51 to 63 months' imprisonment. After considering the 18 U.S.C. § 3553 factors, the Court downwardly varied and imposed a sentence of 24 months' imprisonment. O'Malley timely appealed.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 18 U.S.C. § 3742. When evaluating sentencing proceedings, we review factual findings for clear error, see United States v. Dullum, 560 F.3d 133, 137 (3d Cir. 2009) (citation omitted), and legal conclusions de novo, see United States v. Thomas, 315 F.3d 190, 204 (3d Cir. 2002) (citation omitted).

## III.

O'Malley contends that the District Court erred by (1) finding that he caused a loss in excess of $200,000, which triggered a concomitant offense-level enhancement, and (2) imposing a sentence enhancement for abuse of trust pursuant to his role at BCIA. We conclude that the District Court's findings of financial loss were not clearly erroneous, nor did the District Court err in finding that O'Malley held and abused a position of trust. We will, therefore, affirm the judgment of the District Court.

On the first issue, O'Malley challenges the District Court's 12-level loss enhancement, arguing that: (A) the loss calculation was incorrect; (B) the loss finding was inconsistent with the Court's failure to order restitution; and (C) the District Court improperly used O'Malley's gain to determine loss. We address these arguments in turn.

## A.

3

O'Malley repeats arguments he made to the District Court that his fraudulent loans did not cause any monetary loss to the lenders and proposes several alternative ways to calculate loss, all of which would result in a loss under $200,000 and a lesser enhancement. Indeed, O'Malley contends that it is "undisputed" that there was "no loss" and that the District Court did not find a loss whatsoever, incantations he repeats throughout his brief. See, e.g., Brief for Appellant 3, 4, 9, 13, 14, 16, 18, 19, 21, 22. This assertion is plainly untrue, and the accompanying contention lacks merit.

Under U.S.S.G. § 2B1.1, the offense level increases proportionally with the amount of loss. A loss between $200,000 and $400,000 carries with it a 12-level increase. See U.S.S.G. § 2B1.1(b)(1). The government must prove loss by a preponderance of the evidence, after which the burden shifts to the defendant. See United States v. Jimenez, 513 F.3d 62, 86 (3d Cir. 2008) (citation omitted). The District Judge, who "is in a unique position to . . . estimate the loss," "need only make a reasonable estimate of the loss. . . . based on available information." U.S.S.G. § 2B1.1 cmt. n.3(C); see United States v. Ali, 508 F.3d 136, 145 (3d Cir. 2007). This determination is reviewed for clear error, see Dullum, 560 F.3d at 137 (citation omitted), and may be reversed only if it is "'completely devoid of a credible evidentiary basis,'" United States v. Vitillo, 490 F.3d 314, 330 (3d Cir. 2007) (quoting United States v. Haut, 107 F.3d 213, 218 (3d Cir. 1997)), and the Court is "left with a definite and firm conviction that a mistake has been committed," United States v. Lessner, 498 F.3d 185, 199 (3d Cir. 2007) (citations omitted); see Krasnov v. Dinan, 465 F.2d 1298, 1302 (3d Cir. 1972) ("It is the responsibility of an appellate court to accept the factual determination of the fact-finder unless that determination either (1) is completely devoid of evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data.").

At O'Malley's sentencing hearing, after acknowledging the general difficulty of determining loss in a mortgage fraud case, the government argued for a "concrete, readily ascertainable," "reasonable" and "quantifiable estimate of the loss in this case": specifically, "the fees that Residential Mortgage convinced the lenders to pay." App. 00052, 00062. The government's theory, as explained at the hearing, was that this figure represented a pure loss to the lenders because the lenders paid a commission for loans that they would not have offered had they known the truth about the mortgagor's creditworthiness. Given the vastness of O'Malley's falsifications, the District Court agreed that the "easiest" measure of loss in this case was the amount the lenders paid in fees during the course of the scheme. App. 00062, 00073-00074. Using this rubric, the Court found a loss of $204,684 and imposed a 12-level enhancement.

In light of the evidence and the difficulty in calculating mortgage fraud loss, the District Court's conclusion was a "reasonable estimate of the loss" based on "available information," U.S.S.G. § 2B1.1 cmt. n.3(C). We cannot say this finding was "completely devoid of a credible evidentiary basis," Vitillo, 490 F.3d at 330 (internal quotation marks and citation omitted), nor are we "left with a definite and firm conviction that a mistake has been committed," Lessner, 498 F.3d at 199 (citations omitted). We thus will not disturb the District Court's finding.

B.

O'Malley attempts to undermine this finding of loss by arguing that it cannot be reconciled with the District Court's failure to award restitution. O'Malley contends that restitution is mandatory if an actual loss has occurred, and that the District Court's statements about the lack of an identifiable loss for restitutionary purposes preclude it from finding a loss for sentencing purposes. See App. 00055 ("[W]hen I have no

5

identifiable loss from the bank, how do I structure restitution?"); App. 00057 ("I'm still trying to figure out why should somebody get back a restitution when they really didn't lose anything to begin with.").

But there is "no logical reason" that the Court's "absolute denial of restitution necessarily implies the conclusion that the [lenders] had no loss." United States v. Kelley, 76 F.3d 436, 440 (1st Cir. 1996). Although a sentencing court's authority to decline to order restitution is limited under 18 U.S.C. § 3663A, there are times when a court may choose not to enter such an order.  See, e.g., 18 U.S.C. § 3663A(c)(3)(B) (authorizing a court to decline to order restitution if the burden caused to the sentencing process by necessary fact-finding would outweigh the need to provide restitution). Moreover, findings of loss for sentencing enhancements and restitution do not necessarily go hand in hand, and this is a sentencing appeal, not a restitutionary appeal. Any possible inconsistencies caused by the District Court's failure to award restitution would not negate its lengthy findings of loss for sentencing purposes.

C.

Finally, O'Malley contends that the District Court improperly looked to his gain to reach its loss figure, directly contravening the Guidelines' clear prohibition against using gains to calculate a loss. See U.S.S.G. § 2B1.1, Appl. Note 3(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it cannot reasonably be determined."). Because the District Court clearly found a loss, based on estimates of the fees paid by the lenders for loans that they would otherwise never have entered, see App. 00073-00074 ("I'm going to attribute the loss to the fees paid.");  App. 00102 ("I've already found there is a loss for the Guideline purposes."), this argument is misguided. To be sure, the District Court said that it had looked in part to

6

the "default gain" to calculate loss. App. 00103. But the rest of its lengthy evaluation makes pellucid that, even if that amount constituted a gain to O'Malley, it equally constituted a loss to the lenders. See App. 00052, 00073-00074. Indeed, the Court explained that it would not deduct O'Malley's expenses from this amount because it represented "what's paid by the lender," App. 00062-00063—in other words, a "loss"— and was not meant to serve as an approximation of O'Malley's ill-gotten gains.

In sum, the District Court clearly calculated a loss by looking to the fees paid by the lenders, and that calculation was "a reasonable estimate of the loss," U.S.S.G. § 2B1.1 cmt. n.3(C), that was "plausible in light of the record," United States v. Stewart, 452 F.3d 266, 273 (3d Cir. 2006) (quoting United States v. Kikumura, 918 F.2d 1084, 1090 (3d Cir. 1990)). We will, therefore, affirm the District Court's decision to apply the 12-level enhancement that accompanies such a finding of loss.

IV.

O'Malley next contends that the District Court clearly erred by imposing a two-level enhancement based on his abuse of a position of trust. O'Malley argues that such an enhancement is appropriate only if the defendant occupies a position of trust vis-à-vis the direct victim of the crime, and cannot be applied here because O'Malley's role at BCIA did not implicate the trust of the victim-lenders. We disagree.

Section 3B1.3 "requires the sentencing court to increase the offense level by two," United States v. McMillen, 917 F.2d 773, 775 (3d Cir. 1990), "[i]f the defendant abused a position of public or private trust . . .  in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. To determine an abuse of trust, the sentencing court asks "[f]irst . . . 'whether a defendant was placed in a position of trust,' and second, if he was, 'whether he abused the position in a way that

7

significantly facilitated his crime.'" United States v. Sherman, 160 F.3d 967, 969 (3d Cir. 1998) (quoting United States v. Craddock, 993 F.2d 338, 340 (3d Cir. 1993)). We review the former finding de novo, United States v. Hart, 273 F.3d 363, 376 (3d Cir. 2001) (citation omitted), and the latter for clear error, United States v. Thomas, 315 F.3d 190, 204 (3d Cir. 2002) (citation omitted).

We consider three factors regarding whether a defendant occupied a position of trust: "(1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in the defendant vis-à-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position." Id. (citing United States v. Iannone, 184 F.3d 214, 223 (3d Cir. 1999)). Once established, we next ask whether the defendant "abused that position in a way that significantly facilitated his crime." Craddock, 993 F.2d at 340. This second prong "is easily met." Sherman, 160 F.3d at 970.

Here, it is apparent that O'Malley occupied a position of trust, and the District Court's conclusion that he abused that position is not clearly erroneous. See App. 00074 ("There's no question that [O'Malley] had [a position of trust] at the BCIA, and there is no question that he had other people doing certain things to falsify the records, falsify the fact that people were working here when they did not."). O'Malley argues forcefully that the District Court erred in so finding because his chairperson status at BCIA was not a position of trust vis-à-vis the lender-victims. This argument is misplaced, for two reasons.

First, O'Malley's contention that his position at the BCIA cannot be considered for a § 3B1.3 enhancement because the BCIA was not a victim is, as we held long ago, "plainly wrong." United States v. Cianci, 154 F.3d 106, 112-113 (3d Cir. 1998) (holding that the plain text of the Guidelines permits a court to consider all of a defendant's

"relevant conduct" in applying a § 3B1.3 enhancement, including the defendant's abuse of a position of trust with a non-victim in furtherance of the crime). To be sure, there is a circuit split on this issue. Compare, e.g., United States v. Guidry, 199 F.3d 1150, 1160 (10th Cir. 1999) (holding that this enhancement requires the defendant to hold a position of trust vis-à-vis the direct victim of the offense), with United States v. Cruz, 317 F.3d 763, 766 (7th Cir. 2003) ("Courts may apply the abuse of trust enhancement even if the defendant did not occupy a position of trust in relation to the victim of the offense . . . ."). Though this split may provide a fecund starting point for a law review article, Cianci is the law that binds this Court. And under Cianci, it is clear that O'Malley occupied a position of trust at BCIA. His role there—and his capacity in that role to concoct faux W-2's, paystubs, and other proofs of employment—(1) "allow[ed] [him] to commit a difficult-to-detect wrong"; (2) vested him with almost unchallengeable authority "vis-à-vis the [lenders]," who could not readily contest the falsified data; and (3) almost necessarily required lenders' "reliance on [his] integrity" as BCIA's chairman and commissioner. Thomas, 315 F.3d at 204 (citation omitted).

Second, irrespective of O'Malley's position at BCIA, that position is not the only one that concerns us here. O'Malley was the co-owner and principal of a mortgage corporation that acted as a middleman between borrowers and lenders in exchange for commissions and other fees from the lenders. Mortgage brokers plainly hold positions of trust with respect to their client lenders, who depend on them to provide accurate information about prospective borrowers.[1] Cf. United States v. Septon, 557 F.3d 934,

---

[1] O'Malley argues that the government waived the argument that his role as a mortgage broker was a position of trust by not raising it below. Even if the government failed to press this argument, we review this issue de novo and "may affirm the rulings of the District Court for any proper reason that appears on the record even where not relied on by it." United States v. Perez, 280 F.3d 318, 337 (3d Cir. 2002) (citation omitted). Here,

937-938 (8th Cir. 2009); United States v. Wright, 496 F.3d 371, 377 (5th Cir. 2007). But see United States v. Fuchs, 635 F.3d 929, 936-937 (7th Cir. 2011). O'Malley's position as a lender-preferred mortgage broker (1) "allow[ed] [him] to commit a difficult-to-detect wrong"—indeed, he successfully pulled off his scam for years before being discovered; (2) vested O'Malley with an immense "degree of authority . . . vis-à-vis the [lenders]," who often relied on O'Malley's misrepresentations; and (3) secured that reliance using his perceived "integrity" as the head of the company. Thomas, 315 F.3d at 204 (citation omitted).

Under either of these formulations, the District Court's finding that O'Malley abused his position of trust by falsifying pay stubs, W-2s, and letters of employment, and directing BCIA staff to do the same, was not clearly erroneous. Accordingly, we have little difficultly affirming the District Court's application of a two-level enhancement.[2]

\* \* \* \* \*

We have considered all of the arguments advanced by the parties and conclude that no further discussion is needed. The judgment of the District Court will be AFFIRMED.

---

the record supports our holding as to O'Malley's position of trust both at the BCIA and as a mortgage broker.

[2] O'Malley contends that the District Court improperly relied on his position at BCIA as the basis for more than one sentence enhancement. Even assuming that it would be wrong to consider O'Malley's role at BCIA for all of these enhancements, the record reveals that the Court "relied on different facts to support each enhancement," United States v. Wong, 3 F.3d 667, 669 n.4 (3d Cir. 1993), a reality that vitiates this argument.